PEOPLE v THOMAS HINTZ

PEOPLE v LAWRENCE HINTZ

1. CONSPIRACY—MUTUAL UNDERSTANDING—TWO OR MORE PERSONS—
   CONSPIRACY TO COMMIT MURDER—INTENT—KNOWLEDGE.

   Criminal conspiracy is a mutual understanding or agreement
   between two or more persons, express or implied, to do or
   accomplish some criminal or unlawful act; to prove conspiracy
   to commit murder it must be established that the defendants
   intended to murder a victim and in order to establish that
   intent, there must be evidence of knowledge of the unlawful
   purpose of murder, and furthermore it must be proven that
   that intent was possessed by each defendant.

2. CONSPIRACY—EVIDENCE—CIRCUMSTANTIAL EVIDENCE—INFERENCE.

   A conspiracy may be established by circumstantial evidence and
   may be based on inference.

3. CONSPIRACY—TERMINATION—AFFIRMATIVE ACT—WITHDRAWAL
   FROM CONSPIRACY.

   A conspiracy, once formed, continues to exist until consummated,
   abandoned or otherwise terminated by some affirmative act; an
   alleged withdrawal by one of the conspirators before anything
   is done in furtherance of the agreement is no atonement and
   will not justify reversal of a verdict of guilty of conspiracy.

4. CONSPIRACY—OVERT ACT—ALLEGATION AND PROOF—ILLEGAL
   AGREEMENTS.

   Allegation and proof of an overt act in furtherance of an illegal
   agreement is not required to prove a criminal conspiracy.

5. EVIDENCE—CRIMINAL LAW—CONSPIRACY—BOMBING—POSSESSION OF
   BOMB—SIMILAR PLAN OR SCHEME.

   The bombing of a police officer's house and the possession, by one

REFERENCES FOR POINTS IN HEADNOTES

[1, 5, 6] 16 Am Jur 2d, Conspiracy §§ 20, 36.
[2] 16 Am Jur 2d, Conspiracy §§ 36, 59.
[3] 16 Am Jur 2d, Conspiracy § 29.
[4] 16 Am Jur 2d, Conspiracy §§ 11, 22.

of the defendants to a charge of conspiracy to commit murder, of a bomb were admissible as evidence against the defendants to the conspiracy charge since such evidence was probative of a similar plan, scheme or system of killing police officers with pipe bombs.

6. Conspiracy—Penalty—Conspiracy to Commit Murder—Life Imprisonment—Statutes.

A defendant convicted of conspiracy to commit an offense which carries a penalty of one year or more imprisonment in a state prison shall be punished by a penalty equal to that which could be imposed upon a conviction of committing the crime the defendant conspired to commit; therefore, where defendants were convicted of conspiracy to commit murder, a sentence of 15 to 25 years in prison was not erroneous, since the maximum penalty for murder is life imprisonment (MCLA 750.157a, 750.316, 750.505; MSA 28.354[1], 28.548, 28.773).

Appeal from Midland, James R. Rood, J. Submitted April 7, 1976, at Lansing. (Docket Nos. 23425-26, 25046.) Decided May 27, 1976. Leave to appeal denied, 397 Mich —.

Thomas L. Hintz and Lawrence L. Hintz were convicted of conspiracy to murder. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Edward G. Durance,* Prosecuting Attorney, and *Robert J. Rhead,* Chief Assistant Prosecuting Attorney, for the people.

*Sinclair & Clulo,* for defendant Thomas L. Hintz.

*Wilson, Stone and Beale,* for defendant Lawrence L. Hintz.

Before: T. M. Burns, P. J., and V. J. Brennan and D. E. Holbrook, Jr., JJ.

T. M. Burns, P. J. The defendants were charged in separate counts with conspiring to aid and abet in the placing of an explosive with intent to de-

stroy and conspiracy to murder one Myron J. Whipple. After a nonjury trial, the court found defendants guilty of the second count, conspiracy to murder. The defendants were sentenced to 15 to 25 years in prison.

In his opinion, the trial court set out the following statement of facts:

"On April 25, 1974, during the evening hours, an explosion occurred outside of the front portion of the residence of Robert Schlosser, a Midland Police Officer, located at 408 Cottonwood Street, in the City of Midland. Fragments of pipe, residue of powder and a piece of burnt dynamite fuse were discovered at the scene of the explosion as the result of an investigation made at the scene.

"Portions of the front of the house were damaged, as well as the porch on the residence. The explosion, apparently occurred in front of a picture window in the front of the home.

"The explosion was under investigation by the law enforcement authorities until the arrest of the Defendants on June 20, 1974.

"On or about April 26, 1974, one, Edward Shannon, was talking with the Defendant, Lawrence Hintz, at the home of Shannon on St. Charles Street in the City of Midland. During the course of this conversation, the Defendant, Lawrence Hintz, stated to Shannon substantially as follows: Did you read about the big bang? That he had thrown a bomb at Schlosser's house; That it didn't do the damage that they intended; That the bomb bounced away from the house.

"A short time later, on or about the 1st of May, another conversation occurred with the Defendant, Lawrence Hintz, at the home of Mr. and Mrs. Wayne Gardner, located at 4512 W. Wackerly Road. The Gardners and the Shannons were friends and were visiting and eating a meal and Lawrence Hintz was present at this time. Mrs. Shannon and Mrs. Gardner were talking together regarding the explosion at the Schlosser home on April 25th which had been mentioned in the news-

paper. The newspaper article did not give the name of the officer, nor had either Mrs. Gardner nor Mrs. Shannon referred to the Schlosser home. Defendant, Lawrence Hintz, overhearing the conversation, said—"You mean Schlosser's home. Next time there will be a bigger bang." The fact that the Defendant, Hintz, referred to the location of the explosion as being the Schlosser home drew the attention of Mrs. Shannon and Mrs. Gardner because of the fact as stated above that the name had not been previously mentioned and they had, apparently, no knowledge whose home it was.

"A short time later, the Defendant, Lawrence Hintz, came to the farm of Edward Shannon and stated that he wished to obtain some more dynamite fuses and that he wanted Shannon to make some bombs for him. It appears that Shannon had knowledge as to the construction of bombs because of the fact that he had used dynamite and powder in connection with his farming operations and many years before, while a resident of Missouri, he had used explosives for the purpose of stunning fish. It appears that approximately two weeks prior to this conversation that Shannon had given the Defendant, Lawrence Hintz, some dynamite fuses at his request, the Defendant stating at that time that he wanted to blow a stream (apparently the stunning of fish). The Defendant stated at this time that his brother, Gregory, had hidden the fuses previously given to him and that he, therefore, needed some more. He further stated that he and Thomas Hintz, his cousin, desired to make seven bombs in all; that three of these bombs were to be used in Midland—one against Myron Whipple, a detective in the Sheriff's Department; one against William Maxwell, a Midland County Sheriff's Officer; and one against Robert Schlosser, a Midland City Police Officer, being the same police officer referred to hereinbefore.

"Edward Shannon lives in the City of Midland, at 425 St. Charles Street. He was employed at the time of the occurrences as a custodian for the Midland Public Schools. He also operated a farm which he owned in Homer Township, Midland County. Shannon was acquainted with both Defendants, but had known Law-

rence Hintz for a number of years and was quite friendly with him.

"On or about the 2nd or 3rd of May, the Defendant, Lawrence Hintz, came to the Shannons' home on St. Charles Street and stayed for the evening meal. During this visit Shannon asked the Defendant if he still intended to go through with the making of bombs. The Defendant answered that he did. Shannon then informed the Defendant that if he desired him to make bombs that he (Lawrence) would have to furnish the pipe, the caps for the pipe and the powder. Lawrence also stated at this time that he and his cousin, Thomas, wanted the bombs.

"Shortly after this conversation Lawrence Hintz delivered to Edward Shannon some pipe, caps and four pounds of powder, making the delivery at Shannon's farm in Homer Township. The power was Hercules smokeless powder of a type readily purchased at a sporting goods store.

"Shannon discussed these events with his wife and they both became concerned about the information that had been conveyed to them and it was decided that Shannon would contact Detective Whipple, which he did on or about May 1, 1974, advising him of the conversations that he had had with Lawrence Hintz, as well as the other facts in connection therewith. At this time Detective Whipple took a statement and arranged to have Shannon work with him and the Michigan State Police. Shannon's kitchen at his farm was wired by the State Police with a tape recording device and arrangements were made to place a body transmitter with Shannon to be used by him whenever the opportunity arose and arrangements could be made to have State Police officers listening in the immediate vicinity.

"On or about May 8, 1974, the Defendant, Lawrence Hintz, again came to the farm home to talk with Shannon about the building of bombs and they, at this time, discussed the matter including the size of the bombs that should be used, the length of the fuses that should be used. At this time Defendant, Lawrence, stated that Thomas was supposed to come to this meeting but that he had to work and couldn't make it. Lawrence stated that Thomas wanted the bombs right

away. The next day Shannon met Lawrence Hintz on St. Charles Street in the City of Midland. At this time Lawrence wanted to get together with Shannon and with his cousin, Thomas. He also asked Shannon if he could make the bombs right away.

"A short time later, the Defendant, Thomas Hintz, came to the Shannon farm. At this time he asked Shannon to get the bombs made. He stated at this time that he had missed the meeting a few days earlier between Shannon and his cousin, Lawrence, because of the fact that he had to work.

"It appears that Shannon was having contact with Lawrence Hintz on almost a daily basis during the months of May and into the month of June. In the latter part of May, Lawrence informed Shannon that Thomas Hintz wished to obtain an electric bomb to be attached to Whipple's car. A short time later, Lawrence delivered to Shannon a set of spark plug wires, as well as connectors for the spark plugs and a distributor of a type commonly obtainable from an automobile supply store. These were delivered to Shannon in order to enable him to build a bomb to be placed in Whipple's car which would detonate when the ignition key was turned on. Lawrence stated that Thomas had asked for the electric bomb.

"On or about the 25th of May, a conversation occurred between Shannon and Thomas Hintz at which time Thomas stated that there were several bombings that he wanted to accomplish stating that he wanted to blow up Myron Whipple, John Lapp (a Sheriff's Department Officer), and Schlosser. He also stated that he was intending to bomb another State Police Officer in Lansing and another one in Grand Rapids.

"On or about the 1st of June, Edward Shannon and Thomas Hintz made a trip to Saginaw to the home of some Mexican people there. Defendant, Thomas Hintz, had previously stated that these Mexicans had offered him $30,000.00 to blow up a State Police Officer who was an undercover man in the narcotics division. Thomas had discussed the Mexican connection with Shannon on three different occasions. During the course of this conversation Thomas discussed various ways of killing Myron Whipple. One method discussed was by

an electrical bomb in his car. The second method was by going to the door of the motel where Whipple was staying apart from his family and when he opened the door to shoot him; and the third method was by the means of a bomb. A discussion was also had about the proper way to use an explosive device in an automobile in connection with the ignition system.

"Shannon constructed a pipe bomb on or about June 1st from the pipe and powder furnished by Lawrence Hintz. He placed this bomb in his truck. This bomb was taken by Thomas Hintz from the truck and later returned to the Shannon farm by Lawrence Hintz.

"On the 15th of June of 1974, a conversation was had between Shannon and Thomas Hintz. This conversation took place at the farm home of Edward Shannon and was recorded. The record was later transcribed and received in evidence as People's Exhibit #14. Many parts of this transcript are inaudible, but, it is apparent from a reading of same that Shannon and Thomas Hintz were discussing the handling of bombs and the proper way to construct them. At one point on Page 4 Shannon and Hintz were apparently discussing the caps on the pipe-type bomb and referring to the fact that the caps previously furnished by Lawrence Hintz had holes drilled in them.

"Thomas Hintz stated: 'I didn't drill these. They were already drilled. (Inaudible)'

"Shannon then stated that he noticed that they were drilled and that he had said to Lawrence—why did you drill these.

"Thomas Hintz replied: 'They were already like that.'

"Later on Page 5 Thomas Hintz stated, referring to a bomb: 'That's why I wanted one for the car for so I could crawl up underneath (Inaudible) between the frame and the body and run the spark plug wire (Inaudible). So when he starts it up, boom. (Inaudible)'

"Edward Shannon: 'Okay, but you don't want dynamite to do that, Tom.'

"Thomas Hintz: 'Why?'

"Edward Shannon: 'Dynamite goes down. All it is going to do is jar him. It is going to scare the shit right out of him, but it ain't going to hurt him.'

"Thomas Hintz: 'Yeah, that's right.'

"Edward Shannon: 'But, now I'll tell you how you do it and it will hurt him. Tip it straight up and down, stand it straight up and down and it goes both directions, you see.'

"Thomas Hintz: 'Yeah.'

"Edward Shannon: 'A lot of guys lay it in like this, flatways and it don't do a fucking thing for them, but you stand it straight up and down, man, it goes every direction. Then you got him. There's no way (Inaudible).'

"Thomas Hintz: (Inaudible)

"Edward Shannon: (Inaudible)

"Thomas Hintz: (Inaudible)

"Edward Shannon: '(Inaudible) You did this wrong, though?'

"Thomas Hintz: 'I know. You see, I drove by to see if he was home and the lights were on so I just drove by and threw it at his house.'

"On Page 7, Thomas Hintz stated: 'No, I have got to admit that it's because he gave me a ticket for reckless driving. (Inaudible)'

"Edward Shannon: 'Yeah, but man, his fucking kids were in there.'

"Thomas Hintz: 'Well, it was in the front room and it was late at night. (Inaudible).'

"On Page 8, the parties are apparently discussing the arrangements above referred to with the Mexicans in Saginaw.

"Thomas Hintz: 'You want to make some money like these Mexicans that offered me thirty thousand dollars to kill one cop that busted them?'

"The discussion continues further regarding the offer of the Mexicans in Saginaw to furnish money. There is no point in reproducing all of this discussion here.

"On Page 9, Thomas Hintz states as follows referring to the party that the Mexicans apparently desired to have eliminated:

"Thomas Hintz: 'The guy's name is Mike Robinson in Lansing, he's a cop in Lansing.'

"On Page 9, the parties were also discussing how to light fuses. Shannon was telling Thomas Hintz how to time a fuse in connection with the use of dynamite. At this point, Thomas Hintz stated on Page 10—'That night I had a hell of a problem with it. I had one guy driving (Inaudible). Anyhow, here's how we did it. We got a car out at McArdle's. (Inaudible) Drove down Waldo (Inaudible) He drove and I got, in the backseat. (Inaudible) It was burning awful slow. (Inaudible)'

"Another conversation with Defendant, Thomas Hintz, was had on the 20th day of June and this conversation was also recorded and transcribed. The parties were, apparently, discussing the negotiations that Thomas had had with the Mexicans in Saginaw and he states on Page 1:

"Thomas Hintz: '(Inaudible) So they are cutting out, going to Canada. One guy is in jail for killing a couple (Inaudible). He had fifteen felonies on him so he's going to jail. One of the guys is Mexican. He had one of his own partners killed. (Inaudible) Apparently, they know who did it anyway, you know. Now he is hanging around with the guys that killed his partner (Inaudible) don't even want to put up the money because he says that there is no sense because the guy already went to court and testified against him in front of the judge, so, he pointed him out in the courtroom (Inaudible). They have all that down in the record and shit like that you know, but there is still a couple of them that think they want it done because they are going to have a jury trial and the jury—he hasn't testified in front of the jury yet.'

"Edward Shannon: 'Yeah, okay. How many is there then all together?'

"Thomas Hintz: 'So far there is two or three that still want it done, you know. They are willing to pay a thousand, but (Inaudible). Check around because this guy busted quite a few people. The guy is from Battle Creek, not Lansing. (Inaudible).'

"Edward Shannon: 'Okay.'

"Thomas Hintz: '(Inaudible) The judge and everybody on the record—he found out (Inaudible) they got their lawyer and that trying to get it down. He graduated

from a certain high school in Battle Creek and his father's name and all that shit he's from Battle Creek.'

"Edward Shannon: 'What is his address, do you know?'

"Thomas Hintz: 'No, they couldn't get that out of him.'

"Edward Shannon: 'Okay.'

"Thomas Hintz: 'The Prosecuting Attorney got up and said, "I object," you know (Inaudible) they didn't want to give out his address.'

"Edward Shannon: 'What's his name?'

"Thomas Hintz: 'His name is Mike Robinson from Battle Creek. (Inaudible)'

"In the transcript of June 20 further discussion was had regarding numerous things not deemed necessary to reproduce in this opinion, however, Shannon discussed with Thomas Hintz the fact that he would place a pipe bomb which he had made in his pick-up truck and that his truck would be parked at Central Junior High where Shannon worked on the evening of June 20.

"On this particular evening, Detective Whipple was at a point where he could observe the pick-up truck of Edward Shannon, parked by the school. At 10:20 p.m. Thomas Hintz came to the truck, removed an article and placed it in his car. Thomas Hintz was driving a Buick Skylark. At 10:30 p.m. that evening the State Police stopped Defendant, Thomas Hintz's car and removed the pipe bomb from the car. The bomb was a galvanized pipe, 18 inches long, containing smokeless powder and a fuse. The fuse, however, had been deactivated in such a way that it would not explode the bomb. Following this episode, the Defendant, Lawrence Hintz, was also arrested.

"An expert from the State Police Scientific Crime Laboratories examined the pipe bomb; found that it contained Hercules powder known as 'Herco'.

"There was a great deal of testimony in the case from expert witnesses. This expert testimony established the fact that the powder furnished by Defendant, Lawrence Hintz, to Shannon was of the same type, to-wit: Hercules smokeless, as that used in the bomb which had been

exploded at the Schlosser home on the 25th of April 1974. It was also shown that a fragment from the bomb exploded at the Schlosser residence was of the same type of pipe that had been furnished by the Defendant, Lawrence Hintz, to Shannon. The various pieces of pipe, pipe caps, shotgun primers and other items were received in evidence. An experiment conducted by the bomb experts was based upon a duplicate bomb constructed by them of the same type taken from Thomas Hintz and previously built by Shannon. This bomb was detonated and pictures were shown and received in evidence showing the effect of the explosion. The Court can see no point in going into minute detail as to the various and numerous exhibits received in evidence."

The trial court found that there was a conspiracy between defendants Hintz to use explosive devices in order to injure or kill Schlosser. He found that both defendants made statements and took action in furtherance of the conspiracy to make another attempt on the life of Schlosser and that the conspiracy broadened to include other police officers, including Whipple. The court found that both defendants knew of the plan and intended to inflict great bodily harm upon Whipple calculated to cause his death.

Both defendants appeal their convictions and sentences.

The principal arguments of the defendants on appeal are that the evidence was legally insufficient to support a verdict of guilty of conspiracy and that the evidence was insufficient to prove guilt beyond a reasonable doubt.

Criminal conspiracy is a mutual understanding or agreement between two or more persons, express or implied, to do or accomplish some criminal or unlawful act. *People v Atley,* 392 Mich 298; 220 NW2d 465 (1974), *People v O'Connor,* 48 Mich App 524; 210 NW2d 805 (1973). To prove conspir-

acy in the instant case, it must be established that the defendants intended to murder Whipple, and to establish that intent, there must be evidence of *knowledge* of the unlawful purpose of murder. Furthermore, it must be proven that that intent, including that knowledge, was possessed by both Thomas and Lawrence Hintz. *Cf. People v Atley, supra,* at 310.

"The gist of the offense of conspiracy lies in the unlawful agreement between two or more persons. [Citations omitted.] Direct proof of agreement is not required, nor is it necessary that a formal agreement be proven. It is sufficient if the circumstances, acts, and conduct of the parties establish an agreement in fact. [Citations omitted.]

"Furthermore, conspiracy may be established, and frequently is established by circumstantial evidence, [Citations omitted] and may be based on inference." *People v Atley, supra,* at 311.

Most of the evidence against the defendants came from the testimony of Edward Shannon, pertinent parts of which are as follows:

"*A.* He [Lawrence Hintz] said that him [Lawrence Hintz] and Tom wanted some bombs. They wanted seven. And I asked him what he wanted them for. And he said that they wanted to use three right here in Midland. And I asked what for. And he told me one for Myron Whipple, one for a fellow in the Sheriff's Department by the name of Maxwell, and one for Mr. Schlosser.

\* \* \*

"*A.* I told him [Lawrence Hintz] that if he wanted the bombs made he had to furnish the materials to do it. I would furnish the wick.

\* \* \*

"*A.* He [Lawrence Hintz] brought some pipe caps and

chunks of pipe; he brought powder, he brought—well, it was a four pound can pretty near full of powder.

\* \* \*

"*Q.* What are these items?

"*A.* Well, these were for me to make up an electrical bomb with—for Myron Whipple's car.

"*Q.* These items were delivered to you by whom?

"*A.* By Larry Hintz.

"*Q.* When, if you can recall, witness?

"*A.* It was the middle part of May.

\* \* \*

"*Q.* Where were these items delivered to you at?

"*A.* At my home in town.

"*Q.* Why were they delivered to you?

"*A.* I was asked to make an electrical bomb to blow Myron Whipple's car up.

\* \* \*

"*Q. (By Mr. Rhead)* Who was asking you to do this now?

"*A.* Tom Hintz had asked me to make the electric, and Larry was supposed to deliver the stuff to me.

"*Q.* When did Tom Hintz ask you to make an electric bomb?

"*A.* He stopped at my house and we discussed several bombings that he wanted to do."

Defendants make a forceful argument concerning the sufficiency of the evidence, but after a painstaking review of the transcripts and exhibits, we find that the argument must fail. While the record before us indicates that a less than perfect case of criminal conspiracy was made out by the prosecutor, there was sufficient evidence to find the defendants guilty beyond a reasonable doubt of criminal conspiracy to murder Officer Whipple.

There was no proof that Thomas, Lawrence and Shannon met together at any one time and planned or agreed to kill Whipple with an explosive

device. Such ideal evidence of a conspiracy is rarely found. The prosecutor must, perforce, rely upon circumstantial evidence and reasonable inferences drawn from proven facts to make his case.

The primary evidence against the defendants was the testimony of Edward Shannon. He was the link between the defendants and it was Shannon who heard the plans and the express intentions of the defendants. The verdict rested upon the trial court's determination of Shannon's credibility. The trial court believed Shannon, and we do not find the trial court's conclusion to be clearly erroneous. GCR 1963, 517.1.

Lawrence Hintz, perhaps reluctantly, carried out the desires of his cousin by procuring and delivering the materials needed for the bombs. Lawrence knew that the bombs were intended to be used to kill certain persons, including Whipple. He met with Shannon several times and discussed the manufacture of the explosive devices. Despite his later expression that he no longer wished to be involved, Lawrence took an active role in the murder plans. There is no question that Lawrence intended to take part in the conspiracy. It requires no leap in reasoning to infer from the evidence that he intended to murder Whipple, even if he had no great *desire* to do so.

Thomas Hintz was more actively engaged in the planning to murder police officers. He was the instigator of the conspiracy. It was largely his ideas that were given effect by Lawrence and Shannon. Thomas clearly discussed the killing of police officers. There is no question that he intended to conspire with Lawrence and Shannon. It is clear that Thomas discussed with Shannon the murder of Whipple. It was the testimony of Shannon that Thomas requested the manufacture of an

electric bomb to be attached to Whipple's car. Again, it requires no stretching of the imagination to infer that Thomas specifically intended to murder Whipple.

*Does the record support a finding that Lawrence Hintz withdrew from the conspiracy before it came to fruition?*

The following trial testimony of Shannon raises an issue of Lawrence's withdrawal from the conspiracy:

"*Q.* When was the last time you had any contact with Larry Hintz prior to their arrests?

"*A.* It was around the last part of May.

"*Q.* And where was this act?

"*A.* At my home.

"*Q.* Why was Larry at your home?

"*A.* Larry had stopped over to—after work. He was real upset. He said that Tom had been pestering him at work and what we were doing was getting too big for him. He was getting out of it. And he wanted me to get out of it.

\* \* \*

"*Q.* Is that the last time you saw Larry Hintz?

"*A.* It was the last time that I saw him. Yes.

\* \* \*

"*Q.* Did he indicate any way to you whether or not he didn't want to be involved with the Whipple situation?

"*A.* All Larry said was he didn't want anything more to do with the whole deal.

"*Q.* Were those his exact words?

"*A.* Those were his exact words."

It is generally recognized that once formed, the conspiracy continues to exist until consummated, abandoned or otherwise terminated by some affirmative act.[1]

---

[1] *See* 16 Am Jur 2d, Conspiracy, § 29, p 142.

"Where an agreement to commit a crime constitutes a completed conspiracy without any overt act, it is held that an alleged withdrawal by one of the conspirators before anything is done in furtherance of the agreement is no atonement and will not justify reversal of a verdict of guilty of conspiracy." 16 Am Jur 2d, Conspiracy, § 29, p 142, citing *Dill v State,* 35 Tex Crim 240; 33 SW 126 (1895).

In Michigan, allegation and proof of an overt act in furtherance of the illegal agreement is not required to prove criminal conspiracy. *People v Rosen,* 18 Mich App 457; 171 NW2d 488 (1969), *People v Richards,* 1 Mich 216 (1849).

In the instant case, Lawrence's "withdrawal" from the conspiracy was ineffectual; it was too little, too late. The expressed intention of "getting out of it" came after he had actively participated in the planning of the murders and manufacture of the bomb. There is no indication that Lawrence took any steps to prevent further criminal activity in furtherance of the conspiracy.[2]

*Did the trial court err reversibly in admitting evidence of separate and different crimes allegedly committed by the defendants prior and subsequent to the crimes charged in the information?*

The defendants object to the admission of evidence of the bombing of Schlosser's house and Thomas's possession of the bomb on June 20. The argument is without merit. The connection between the two incidents and the crime with which defendants were charged is patent. The evidence certainly was probative of a similar plan, scheme or system of killing police officers with pipe bombs. See *People v Clark,* 62 Mich App 740; 233 NW2d 856 (1975).

---

[2] *Cf. Marino v United States,* 91 F2d 691 (CA 9, 1937). *See also,* 15A CJS, Conspiracy, § 35(2), p 724.

*Did the trial court err reversibly in sentencing
the defendants to 15 to 25 years in prison for the
common law crime of conspiracy to murder?*

The information charged that the defendants
"did conspire together to murder one Myron Whip-
ple contrary to compiled laws 750.316". MCLA
750.316; MSA 28.548 is the first-degree murder
statute. The defendants argue that the informa-
tion charged them with common law conspiracy
and that, therefore, the maximum sentence should
have been five years under MCLA 750.505; MSA
28.773.

MCLA 750.505; MSA 28.773 provides as follows:

"Any person who shall commit any indictable offense
at the common law, *for the punishment of which no
provision is expressly made by any statute of this state,*
shall be guilty of a felony, punishable by imprisonment
in the state prison not more than 5 years." (Emphasis
added.)

MCLA 750.157a; MSA 28.354(1) provides, in rele-
vant part, as follows:

"Any person who conspires together with 1 or more
persons to commit an offense prohibited by law * * * is
guilty of the crime of conspiracy punishable as provided
herein:
"(a) [I]f commission of the offense prohibited by law is
punishable by imprisonment for 1 year or more, the
person convicted under this section shall be punished
by a penalty equal to that which could be imposed if he
had been convicted of committing the crime he con-
spired to commit."

MCLA 750.316; MSA 28.548 provides as follows:

"All murder which shall be perpetrated by means of
poison, or lying in wait, or any other kind of wilful,

deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary, larceny of any kind, extortion or kidnapping, shall be murder of the first degree, and *shall be punished by solitary confinement at hard labor in the state prison for life."* (Emphasis added.)

The maximum sentence for conviction of conspiracy to murder under MCLA 750.316; MSA 28.548, therefore, is life imprisonment. MCLA 750.505; MSA 28.773 is inapplicable since conspiracy to murder is not an indictable offense at common law for the punishment of which no provision is made by statute.[3]

We find no reversible error.

Affirmed.

---

[3] *People v Potts,* 44 Mich App 722; 205 NW2d 864 (1973), does not stand for the proposition that MCLA 750.505; MSA 28.773 applies to all common law conspiracy convictions.